IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
Charlottesville Division

| | |
|---|---|
| PULLEN FARM, LLC | ) |
| Plaintiff, | ) |
| v. | ) Case No. 3:23-cv-00032 |
| | ) |
| | ) **TRIAL BY JURY** |
| SEEDWAY, LLC | ) **IS DEMANDED** |
| -and- | ) |
| GROWMARK, INC. | ) |
| Defendants. | ) |

# COMPLAINT

Plaintiff, Pullen Farm, LLC ("Plaintiff" or "Pullen"), by counsel, pursuant to Rule 3 of the Federal Rules of Civil Procedure (the "Rules"), files the following Complaint against Defendants, Seedway, LLC ("Seedway") and Growmark, Inc. ("Growmark"), jointly and severally.

Plaintiff seeks (a) compensatory damages and punitive damages in the total sum of **$2,500,000.00**, (b) prejudgment interest on the principal sum awarded by the Jury from September 30, 2022 to the date of Judgment at the rate of six percent (6%) per year pursuant to § 8.01-382 of the Virginia Code (1950), as amended (the "Code"), (c) reasonable attorney's fees, and (d) court costs pursuant to Title 28 U.S.C. § 1920 – arising out of Defendants' fraud, violations of the Virginia Uniform Commercial Code, and breach of contract and guaranty.

1

## I. INTRODUCTION

1. Ryegrass can be deadly to horses. The parasitic nematode Anguina funesta carries the bacterium Rathayibacter toxicus into ryegrass seed heads. The bacteria colonizes and multiplies inside the galls (knots on the plant). Rathayibacter toxicus produces an orange-yellow toxic secretion and the toxicity develops at flowering. Ryegrass that has been infected remains toxic even after the plant has dried up. Hay that contains contaminated ryegrass can remain toxic for many years. Horses are susceptible to ryegrass toxicity. Ryegrass toxicity can be fatal. Rathayibacter toxicus produces the poisonous chemical called corynetoxin. Once the contaminated ryegrass is ingested, it begins to affect the horse's central nervous system.

2. Pullen is a fifth-generation, family-owned farm in Culpeper, Virginia. Pullen farms approximately 2,000 acres, of which 400+/- acres are set aside and used exclusively to grow, harvest, market and sell hay for horses. Pullen has successfully grown and sold hay for horses for many years. It's business is well-known and reputable. In 2022, Defendants approached Pullen with a proposal to sell Pullen a blended orchard grass seed mix that Defendants claimed would be suitable for Pullen's use (to grow into hay quality grass for horses). Pullen purchased $15,090 of the mixed grass seed based on Defendants' representations. Defendants shipped the defective seed to Pullen and intentionally mislabeled the seed bags to conceal from Pullen that the blend contained ryegrass. Defendants fraudulently induced Pullen to buy approximately 3,000 pounds of the seed and plant 132.7 acres with the fraudulent "orchard grass" blend. Pullen's fields are now polluted with ryegrass. Pullen cannot use the fields for their intended purpose until the ryegrass is killed and removed. This process will take at least three (3) years,

costing Pullen almost a million dollars in lost revenue and expense and exposing Pullen to substantial reputational risk and impairment of future earning capacity.

3. In this case, Pullen seeks special damages, including lost profits from the sale of hay, injury to its business and good will, including impairment of future earning capacity, and punitive damages as a result of Defendants' fraud.

## II. PARTIES

4. Pullen is a Virginia limited liability company. None of Pullen's members are citizens of Delaware or Illinois. Pullen grows, harvests, markets and sells hay quality grass to individuals, farms, dealers and others across Virginia and North Carolina. Pullen advertises in *Virginia Equestrian* as follows:

> "High quality hay all grown locally in Virginia
> Pullen farm is your forage supplier you can trust all hay is tested for protein and feed value we produce straight alfalfa. Alfalfa and orchard grass mix. Straight orchard grass and orchard Timothy mix if you are looking for the best hay you can feed we are the place. Delivery available we have both rounds and square and all square are in 21 bale bundle".

5. Seedway is a seed company providing farm seed products as well as lawn, turf, and wildlife products in the United States. Seedway is a Delaware limited liability company whose sole member is Growmark. Growmark is a Delaware corporation headquartered in Illinois. Defendants are registered to transact business in Virginia. They maintain a registered agent, sales force and partners in Virginia, including the Rockingham Cooperative. Defendants sell seed and other products to commercial customers and others for resale to farms throughout the Western District of Virginia.

## III. JURISDICTION AND VENUE

6. The United States District Court for the Western District of Virginia has subject matter jurisdiction over this action pursuant to Title 28 U.S.C. § 1332 (Diversity).

The parties are citizens of different States. The amount in controversy exceeds the sum of $75,000, exclusive of interest and costs.

7.  Defendants are at home in Virginia and subject to general personal jurisdiction and specific personal jurisdiction in Virginia.

8.  Venue is proper in this Court pursuant to Title 18 U.S.C. §§ 1391(b)(1) and (b)(2).

### IV. STATEMENT OF MATERIAL FACTS

9.  In August 2022, Jimmy Dyer, Rockingham Cooperative ("Dyer") and John Falkenstein, Seedway Territory Field Manager for Virginia ("Falkenstein") visited Pullen and spoke with farm manager, Alden J. Pullen ("AJ"). Dyer and Falkenstein promoted a mix of blended orchard grass for use in Pullen's hay fields for the coming year. Orchard grass is known to be a suitable hay quality grass. Dyer and Falkenstein knew that Pullen used the fields to grow hay for horses. They offered to sell Pullen a blended orchard grass mix that would consist of 85% Seedway "Extend" grass seeds and 15% Seedway "Devour" grass seeds. [1]

10. Based on Dyer and Falkenstein's recommendation and representations, Pullen agreed to purchase sixty (60) bags (approximately 3,000 pounds) of the blended

---

[1] According to Seedway's Farm Seed Product Portfolio, "Extend" Orchardgrass is "LATE MATURING – Late maturity with superior yield potential. Good maturity fit with alfalfa. Excellent plant vigor, increased stand persistence, drought tolerance, stern rust resistance and great palatability." "Devour" Orchardgrass is "LATE MATURING – Developed to withstand the rigors of intensive grazing systems which can destroy lesser varieties. Extended periods of hoof traffic and feeding won't deter Devour. Quick to establish, out competing weeds, and producing a better, high yielding pasture. Late maturing can be seeded with clover or alfalfa. High NDFD – very palatable." [https://www.seedway.com/app/uploads/2022/08/SEEDWAY_2023-Farm-Seed-Product-Portfolio-Compressed.pdf].

4

orchard grass. In reliance on Dyer and Falkenstein's representations, Pullen bought the seed and planted it in 132.7 acres of its hay fields.

11. Defendants filled the bags with seed at locations outside Virginia, and created and affixed tags to the bags. Rockingham Cooperative delivered the seed bags to Pullen. Each bag was marked "AJ PULLEN MIX". The tags represented that the bags contained 93.25 percent orchard grass, 1.27% "other crop *variety not stated", 5.08% "inert matter",[2] and 0.40% "weed seed". The tags did not disclose that there was any ryegrass in the mix.

12. Prior to planting the 132.7 acres in fall of 2022, Pullen's fields contained no ryegrass. The planting history of the fields is as follows:

Tract 436 Farm 280
Field 5 & 6 – 13.14 acres
2022 Soybeans

Tract 436 Farm 280
Field 7 – 17.30 acres
2022 Orchard Alfalfa, sprayed twice with Glyphosate

Tract 507 Farm 326
Field 2 – 28.13 acres
2022 Soybeans

Tract 2515 Farm 1864
Field 1 – 6.09 acres
2022 Soybeans

Tract 3075 Farm 2590
Field 9 – 4.68 acres
2022 R R Alfalfa

---

[2] "Inert matter" means "all matter not seeds and includes broken seeds, sterile florets, chaff, fungus bodies, and stones as determined by methods prescribed by regulations." *§ 3.2-4000 of the Code.*

5

Tract 435 Farm 2699
Fields 5 & 4 – 10.62
2022 R R Alfalfa

Tract 420 Farm 259
Field 8 – 72.84 acres (planted 57.84)
2022 Fungus Free Fescue.

13. In December 2022, AJ expressed concern to Dyer that some of the new grass coming up in one of the fields looked like ryegrass.

14. In February 2023, AJ again reported concern to Dyer that the grass in the fields looked like ryegrass. Dyer called Falkenstein to check. Falkenstein responded that Seedway Devour orchard grass "looks like ryegrass". That's all. Falkenstein stated that it was not ryegrass. Falkenstein's statements were knowingly false or were published to Pullen with reckless disregard for the truth.

15. Ryegrass is a prolific, fast-germinating, bunch-forming grass primarily used for quick color and erosion control plantings. Ryegrass has a waxy leaf, which makes it very difficult to kill. Four percent (4%) ryegrass in a field equates to five plants per square foot. Ryegrass tillers, *i.e. each seed produces multiple seed heads*. Orchard grass does not tiller. Ryegrass in a field quickly and aggressively overtakes the late maturing orchard grass. At all times relevant to this action, Defendants were well-aware of the anticipated or actual harm that would be caused to Pullen, its business and its fields from planting ryegrass.

16. In early April 2023, the ryegrass began to head. It appeared to AJ that over fifty percent (50%) of Pullen's fields contained ryegrass. AJ contacted a local expert. Carl Stafford, Senior Extension Agent, Agriculture and Natural Resources with the Virginia Cooperative Extension ("Stafford"), inspected Pullen's fields. Stafford

6

concluded that out of an average of 212 total clumps or groups of plants, 19 clumps consisted of ryegrass. Stafford advised that "9% of the total are ryegrass." AJ called Dyer. Dyer contacted Falkenstein, who said he would come "right away".

17. Weeks later, on April 25, 2023, Falkenstein and Dyer looked at Pullen's fields. They said they were amazed at the amount of ryegrass. Falkenstein told AJ that Seedway would be starting a claim. Falkenstein also revealed that "Messicks" – a farm in Fauquier County that had been sold the same blend of "orchard grass" seed – had the same ryegrass problem.[3]

18. On April 27, 2023, Dave Galer, Seedway Sales Manager ("Galer") and Scott Rushe, Seedway Forage Market Development Manager ("Rushe") and Dyer looked at Pullen's fields in an effort to count the amount of ryegrass. Galer and Rushe admitted that there was "so much" ryegrass that they could not even say how much. Galer admitted to AJ that Seedway and Growmark used the "wrong Extend orchard grass" – they had used seed that was meant for pasture blends not hay fields. Galer said he had bought the seed sold to Pullen at a discounted rate, that it was not meant to be sold to Pullen, but "someone messed up."

19. On May 11, 2023, Adam Robertson, Seedway's Farm Seed Business Manager ("Robertson") and Dyer showed up at Pullen to talk about how to resolve the problem. Robertson looked at the fields and admitted that some of the fields were

---

[3] In addition to Messicks, Seedway sold 20 bags of the alleged "blended orchard grass" to Graves Mountain Farm & Lodge ("GMF&L") in Syria, Virginia. Dyer told AJ that GMF&L's fields were also covered in ryegrass.

"almost 100% ryegrass". Robertson asked for Pullen's lost revenue.[4] He offered to have Seedway buy hay for Pullen to replace the hay lost because of the "messed up" seed. AJ questioned this approach because it would raise red flags about Pullen's business. Purchasers would question why Pullen needed to buy hay. AJ stated that it would be best for Seedway to write the checks to Pullen, and Pullen would buy the replacement hay. Robertson left to go to Messicks, and said he would be in contact "on Monday".

20.     On Wednesday, May 17, 2023, Robertson emailed AJ. Incredibly, Robertson claimed that Seedway did nothing wrong. "I am at a loss as to where the ryegrass in your fields came from, there was certainly a much higher percentage than what came in the seed." In his email, Robertson asserted that Seedway had had samples of the Extend and Devour orchard grass products tested by a "state lab in PA", and that the products came back as 96% to 98% pure seed with "no other crop present in it." Robertson stated that the "sample [of the blend sold to Pullen] you gave me was evaluated by a Registered Seed Technologist, and the entire sample had 4% rye in it." In his email, Robertson misrepresented that "[t]hese findings all line up with what the tag[5] on the mixes stated." Robertson further represented to AJ that the ryegrass must have been "in the soil" and that Pullen's previous crops had "held it at bay." These were

---

[4]     Pullen's average annual harvest (yield on 132.7 acres) is 26,400 small squares of hay, which Pullen sells for $10/square. Accordingly, Pullen lost $265,400 in yearly revenue from the sale of hay as a result the Defendants' fraud and misconduct.

[5]     Robertson must have known that this was an intentional misrepresentation. The bags were filled by Defendants. In filling the bags, Defendants must have known that they included 4% ryegrass in the mix. How did the ryegrass get in the bags? The tags on the bags of seed, placed there by Seedway, did not disclose the presence of ___any___ ryegrass at all. The tags merely stated "1.27% other crop * variety not stated". The 1.27% referred to Tall Fescue that was included in the mix. Defendants completely misrepresented and concealed the fact that the mix contained ryegrass.

8

blatant falsehoods without any evidentiary support. Robertson stated, "I wish I had an answer for this, but our position is that no more than the stated amount arrived in the seed. I realize that was more rye than you expected, but it was said that you[6] could live with a few percent in the fields."

21. AJ responded to Robertson in writing by pointing out the obvious lie: the tags on the bags sold to Pullen did ***not*** disclose the presence of 4% ryegrass. The tags did not disclose ***any*** ryegrass.[7] Pullen purchased the seed for a particular purpose: to grow hay for horses. Pullen never would have purchased the seed if the tags had disclosed the presence of ryegrass. Robertson's position was contemptuous.

22. Robertson never responded to AJ's email because there is no response or justification for Defendants' lies.

23. Pullen delivered samples of the seed to the Virginia Department of Agriculture Seed Laboratory for testing. Those tests revealed that 5.77 percent of the mix in the bags was "crop seed", including 4.5% ryegrass (*Lolium spp.*).

24. In order to mitigate the damage caused by Defendants' misrepresentations and deliberate concealment, Pullen cut and round-baled the fields, and wet-wrapped the hay (almost 700 rolls) to prevent further seeding of ryegrass. In spite Pullen's efforts, including spraying the ryegrass with glyphosate, the ryegrass came back. It will take up

---

[6] Pullen absolutely never said to anyone that it could live with a few percent ryegrass in the fields. Robertson fabricated this statement in an effort to pass blame to Pullen or Rockingham Cooperative.

[7] Defendants intentionally engaged in false labeling in violation of the Farm Seed Act, 7 U.S.C. § 1561(20)(A). Defendants' conduct violated 7 U.S.C. § 1571 (prohibitions relating to interstate commerce in seeds).

to three (3) years to completely remediate the problem and restore the fields to the condition they were in prior to the fall of 2022.

25.     Recently, D.J. Myers, agronomy branch manager at Rockingham Cooperative, confirmed to Pullen that the seed delivered to Pullen was not what Pullen paid for and that it was not fit for its intended purpose as hay quality grass.

## COUNT I – FRAUD

26.     Pullen restates paragraphs 1 through 25 of this Complaint, and incorporates them herein by reference.

27.     In August and September 2022, Seedway and Growmark made material misrepresentations to and intentionally concealed material facts from Pullen for the purpose of (a) procuring Pullen's agreement to purchase seed, and (b) inducing Pullen to pay for the seed and plant it in Pullen's fields.  Defendants misrepresented that the seed would be an orchard grass blend of Seedway Extend and Devour products.  In furtherance of the scheme, Defendants mislabeled the seed bags and knowingly concealed from Pullen the fact that the mix contained at least 4% ryegrass.  When AJ reported that the fields appeared to contain ryegrass, Defendants lied again and said Devour "looks like ryegrass".  Defendants continued to lie through May 17, 2023, when Robertson misrepresented that the tags on the bags disclosed the presence of ryegrass.  Defendants went to extreme lengths to cover-up their fraud.

28.     Pullen reasonably and justifiably relied upon Defendants' misrepresentations and concealment.  Pullen purchased the bad seed mix and planted it.  Pullen was induced by Defendants' misrepresentations and concealment to enter into a business relationship.  But for Defendants' misrepresentations and omissions, Pullen

would never have purchased the seed and never would have planted it in the fields. Defendants were well-aware of the substantial harm that ryegrass would cause to Pullen's business and its fields.

29. Defendants' representations were false at the time they were made. Defendants knew that the bags contained ryegrass, knew that they were misleading Pullen, and intentionally mislabeled the bags in order to make an unjustified profit from the sale of "orchard grass" to Pullen and other consumers in Virginia. Defendants misrepresented and concealed their true ulterior motive and intention, which was to offload the mixed seed on unwitting and unsuspecting customers and obtain Pullen's money under false pretenses.

30. Defendants' statements, actions, omissions and nondisclosure, and concealment constitute fraud in the inducement of contract and actual fraud.

31. As a direct and proximate result of Defendants' fraud, Pullen suffered damage and incurred loss, including, without limitation, loss of income and profits, impairment of future earning capacity, injury to reputation and good will, attorney's fees, court costs, and other damages in an amount to be determined by the Jury, but not less than $2,500,000.00.

## COUNT II – <u>VIOLATIONS OF THE VIRGINIA UCC</u>

32. Pullen restates paragraphs 1 through 31 of this Complaint, and incorporates them herein by reference.

33. By their actions described above, Defendants breached their express and implied warranties to Pullen under § 8.2-313, § 8.2-314 and § 8.2-315 of the Code.

34. Pullen notified Defendants of the breach.

35. As a direct and proximate result of Defendants' violations of the UCC, Pullen suffered damage and incurred loss, including, without limitation, loss of income and profits, incidental and consequential damages pursuant to § 8.2-725, court costs, and other damages in an amount to be determined by the Jury, but not less than $1,500,000.00.

### COUNT III – BREACH OF CONTRACT/GUARANTY

36. Pullen restates paragraphs 1 through 35 of this Complaint, and incorporates them herein by reference.

37. Defendants are persons who sell seeds for producing crops.

38. Defendants materially breached and repudiated their contract with Pullen by failing to supply the agreed seed mix, by including at least 4% ryegrass in the mix, and by mislabeling the bags in violation of § 3.2-4008 of the Code. The seeds sold to Pullen were not true to kind and variety as represented at the time of sale.

39. As a direct result of Defendants' breach of contract and breach of guaranty under § 3.2-4007(a) of the Code, Pullen suffered damage and incurred loss, including, without limitation, loss of income and profits, incidental and consequential damages, court costs, and other damages in an amount to be determined by the Jury, but not less than $1,500,000.00.

Pullen alleges the foregoing based upon personal knowledge, public statements of others, and records in its possession. Pullen believes that substantial additional evidentiary support, which is in the exclusive possession of Seedway, Growmark and their agents, and other third-parties, will exist for the allegations and claims set forth above after a reasonable opportunity for discovery.

Pullen reserves its right to amend this Complaint upon discovery of additional instances of Defendants' wrongdoing.

## **CONCLUSION AND REQUEST FOR RELIEF**

WHEREFORE, Pullen requests the Court to enter Judgment against Defendants, jointly and severally, as follows:

A. Compensatory damages in a sum to be determined by the Jury, but not less than $2,150,000.00;

B. Punitive damages in an amount to be determined by the Jury, but not less than $350,000.00;

C. Prejudgment interest at the rate of six percent (6%) per annum until paid;

D. Postjudgment interest at the maximum rate allowed by law;

E. Attorney's fees pursuant to the rule of law announced in *Prospect Development Co. v. Bershader*, 258 Va. 75, 92, 515 S.E.2d 291 (1999);

F. Costs and other recoverable amounts as allowed by law;

G. Such other relief as is just and proper.

## **TRIAL BY JURY IS DEMANDED**

DATED:      June 5, 2023

        PULLEN FARM, LLC


By: */s/ Steven S. Biss*
    Steven S. Biss (VSB # 32972)
    300 West Main Street, Suite 102
    Charlottesville, Virginia 22903
    Telephone: (804) 501-8272
    Facsimile: (202) 318-4098
    Email: stevenbiss@earthlink.net

    *Counsel for the Plaintiff*